when you're ready. Good morning, your honors, and may it please the court. This appeal concerns a clear error by the district court in selecting a restitution amount. Mr. Forrest participated in an odometer tampering scheme. He agreed to pay restitution to all potential victims of that scheme. At the time of his plea, there were 17 identified victims, and the plea agreement stated that the loss would be investigated during the pre-sentence report process. By the time of sentencing, there were 47 identified victims, and the district court ultimately ordered restitution to be paid to all 47 of those victims. That restitution, of course, was pursuant to the Mandatory Victim Restitution Act, which Congress enacted for a very specific purpose. The purpose, of course, is to compensate victims of fraudulent or other conduct for the full value of their actual provable losses approximately caused by a defendant's fraud. The purpose of the Mandatory Victim Restitution Act is to make the victims whole, and that is to be done from the victim's perspective. The victim should be put in the same position, essentially, as if the fraud had not occurred. How could the district court have achieved that? What's the alternative here to what the district court ordered? Your honor, this is a difficult case because odometer tampering fraud is not something that we can put a hard and fast number on. It's worth $100. It's worth $200 for X amount of miles. The district court, of course, had an obligation to make a reasonable estimate of the loss, but we can't lose sight of the fact that because there are 47 vehicles in this case, that somehow that excuses the district court from having to take some individualized assessment. In particular, in this case, your honor, we do have 47 individuals. The government was aware of where these people were. They were able to get victim impact statements. Only eight of the 47 people responded. But the problem with that is it's not clear to me that the average individual is going to know, particularly if they kept the vehicle, how much damage they actually suffered. It's not commonly known, for example, you roll it back 30,000 miles, it's worth X amount of money. And so that's where the expert comes in. So I'm not sure the victim impact statement necessarily would have been any more accurate. I agree with that, your honor. And I think that the victim impact statements are relevant to the extent that when you're looking at any one of those 47 vehicles, I do think the district court had to at least consider from the victim's perspective what was going on because this is an individualized process. And immediately when we look at Mr. Nussbaum's expert calculations that the district court adopted, there are some concerns with that. Many of the victims, of course, reported that they had no problems whatsoever with these vehicles. And yet when at least five of the eight people who did respond say, I've been driving this vehicle, I have no problems, I am certainly concerned that I got less value than I expected for. But then 32 of these people get paid the entire value that they paid. And that really is the key of our case, where the district court relied on an unreasonable calculation. At core, it really is simple to say that every single one of these 42 individuals received something of value. They got a car. They can drive that car down the street. Many of them are still driving that car. Yet 32 of those individuals were reimbursed the entire value of that vehicle that they paid. What about the fact that on title, I've never tried to sell something with a rolled back odometer, but I know as a buyer I'd be very skeptical. I would say, sorry, it's not worth anything to me. What about that consideration, that the stained title really makes it almost impossible to sell the car? There was testimony about the stained title, the branded title. And that has been an issue that's come up in previous odometer fraud cases. Many courts, of course, rely on the Whitlow 40% approximation. And that comes from testimony that's been in several cases that are cited where experts have talked about a branded title reduces the value somewhere in the neighborhood of 50%. A branded title does not, however, reduce the value to nothing. And that's the problem that we have here. It's not necessarily that the district court couldn't make estimates. It couldn't attempt to assess some sort of value. But when the value that it ultimately lands on is the entire value of an item of physical, tangible property that actually gives value to its owner. What relief are you asking for? What would you like us to do in case we think you're correct on the difficulty with the method that the district court chose? Yes, your honor. So I think the question on appeal is simply, did the district court adopt a reasonable estimate of restitution in this case? And our position is that it did not. We would like the case to be sent back to the district court so that it can do a closer analysis. At root, we think Mr. Nussbaum's calculations are simply too speculative to be relied upon. Well, do you have an alternative suggestion is what I'm asking. So what did the district court choose to do? It's not just something else, am I right? Yes, Judge. There were numerous alternative suggestions posed. Which one do you want? Well, naturally we want the Mr. McCatherin suggestion posed by the defense. But there were other reasonable suggestions. The Whitlow 40% evaluation would be another reasonable suggestion. And why would that be true? I mean, one of the things about the Whitlow cases and Leina cases is that they're dealing with branded titles generally. And they talk about a branded title reduces costs anywhere from 40 to 50%. The court chose 40%. It seemed reasonable. We go along with that, right? But not all branded titles are created equally, right? If you think about branded titles, most branded titles are the result of a total loss claim against the motor vehicle, right? And once that motor vehicle's been repaired, you know, people can look at it and say, yeah, that's probably worth 40 or 50%. That really may not even be the most common branded title now because it's possible that Lemon Law takebacks may be the most common branded title. But odometer rollbacks are a completely kind of different animal because what ends up happening with an odometer is the average buyer doesn't know how much the odometer's been rolled back and so you can't make a reasoned determination of what the values were so all those people just walk away just like Judge Strauss said he would. And it really leaves only on the table buyers who are people who are mechanically inclined, who have a good understanding of the value of vehicles, and they can step up and look at that vehicle and they can say, you know, I don't care. Miles is just a number that's spinning around out here in the world to me because I'm an expert and I can tell you this car still looks pretty sound. Nothing seems to be rattling apart. The engine sounds good. You know, everything's square on it. It seems okay, right? And so that doesn't seem to account for the sort of great diminishment of the potential buyers that happens with odometer rollbacks because I think odometer rollbacks lead people to suspect other forms of malfeasance and fraud when you're looking as a potential buyer. Sure. I think a few things are important to keep in mind, Your Honor. One is that all of these vehicles, or at least the majority of them, were older than 2011, which means that people were not making representations as to the actual mileage on these vehicles. That's certainly a significant point. When we take the 40% valuation question from Whitlow, I think what's really important there is that it's not necessarily that the valuation is 40%. It's that there's some valuation for what the victims received. And I think that's really the key here. It's not necessarily that one number is correct or a different number is correct. It's that the numbers that the district court relied on, at least in extremely large part, at least 32 out of 47, if not all 47, because they were all contaminated or infected by this calculation by Mr. Nussbaum, none of them provide credit to Mr. Forrest for the fact that each of these victims still have a tangible item of property. And when people are going, the average purchase price of these vehicles spread across the entire 180,000. It's roughly $3,800 per vehicle is kind of the price that we're talking about. If you take any used vehicle, branded title or not, you can still sell that vehicle. $500 at the junkyard, $500 for someone to put out at the derby to trash up at a race, something of that nature. And so that's our problem and our concern here, Your Honor, is that the victims are receiving a windfall. Our case has suggested in these kinds of circumstances, it might be appropriate to shift the burden of proof to the defendant to prove what sort of offsets available. What's your reaction to that possibility? Well, I think the law right now, Your Honor, is that the defendant does not bear the burden of proof. The government has the burden of proof. Certainly, if that changed, my argument would change. I think we have some cases that suggest that could be appropriate in certain circumstances. Is that wrong? I don't think that's wrong, Your Honor. And I do see my time has expired. If I could finish my comment. I would simply say that I don't think it's wrong, but to the extent that the defense would have a burden in this case to show that the victims are receiving a windfall by receiving a full purchase price, I think that is established because it's well settled. All 47 of these people have a vehicle, and many of them still have it, still operate it, and still receive additional value from it. Thank you. Thank you. Ms. Lundquist? Uh-oh. May it please the Court, Counsel, Kindra Lundquist on behalf of the United States. The District Court did not clearly err in awarding restitution to 47 victims of defendant's odometer fraud scheme. At the time of sentencing, both the government and the defendant had obtained experts to submit the loss and restitution figures to the District Court. The government's expert testified extensively in support of his methodology. The defense expert did not testify, and his calculations were submitted through a report. The defense expert's calculations were flawed in that he used commercial car buying guides to estimate the loss in this case. But those guides, as established in the evidence at sentencing, assume clear title. They assume actual miles, and that is, of course, what we did not have here. We had odometer rollback cars. Given all of that, it was not air for the Court to reject the defense expert's calculation and accept the calculation by the government's expert. The trouble and difficulty I have with that, at least as a prima facie matter, is that apparently 70 percent of the victims in this case had the value of their vehicles reduced to zero, and that clearly, that can't be correct. I mean, most of these cars were drivable. They had a salvage value. They had some value. Zero seems, especially for 70 percent of the automobiles, to be excessive. Thank you for addressing that point, Your Honor. In this case, it is not a windfall for 32 of the 47 victims to receive their money back. There are additional costs that are not being compensated. In this case, victims who had to replace whole engines, who had to go out and buy parts. They were throwing good money after bad because they did not know that the mileage on their car was fraudulent. Also, circling through the cases and the evidence at this case, was that true miles, unknown branded titles, cars with those types of titles have very little value. Looking through the cases, I think it is the Fraza case out of the Seventh Circuit. There is a quote from the District Court there saying, there is a way of looking at this where the consumer has got something that is absolutely worthless. Similarly, the government expert, Mr. Nussbaum, testified in a similar respect. He was not awarding or not looking at the value on resale because if he was going to do that, the total restitution would actually increase. There is a good car that is an example of that. Of course, that is the 2014 Mustang. Whereas if he was going to look at the resale value, the TMU value, the restitution would have increased substantially for that victim. So why not have at least a representative sample of the victims say how much they spent on repairs and then you could normalize that over the entire class. Here we have nothing to suggest. I am sure there were people who had unexpected repairs, but I don't think the District Court knew that, at least for most of them, and I don't think we have any evidence in the record that they did. So what we had in the record were examples through the grand jury transcripts submitted as government exhibits and we also had victim impact statements from several of the victims. But the information that was used to calculate restitution was from the government summary spreadsheet looking at the numbers for what the victims paid, the miles that were rolled off of the cars, and that is consistent with what previous courts have done in these types of cases. Again, information about what certain victims experienced was put into the record as examples and the cases don't have examples cited within them. But doesn't every car have at least a salvage value where you take it to a junkyard and they pay you $500 for the parts or the scrap metal or whatever? Why not at least start the valuation at that number? In the Sutton case from out of the Tenth Circuit, the defendant similarly argued that the cars had some kind of inherent value that was not being accounted for, that was not being taken into the calculation. And the Tenth Circuit noted that the defendant hadn't put forward any estimation of what that value was. Now the government has the burden to prove restitution and here the government provided multiple calculations, the defense provided its own calculation. And again, a through line through many of these cases seems to be that a true miles unknown title branded car is very difficult to assign some real value to it. That would be true for buyers. I'm not so clear that that would be true for salvage value. I mean, if you're doing it for parts or you're doing it for the scrap metal, I would think that that would be true no matter how many miles on it because you're not using it to drive it. Could you repeat that question? Well, you're just not, when you're talking about salvage value, you're not using it to drive it. You're using it for the parts and the scrap metal. So I don't think the mileage makes any difference whatsoever because you're not driving the car. That's true, Your Honor. I think though, here the testimony was that most dealers won't even accept these cars and trade it. We're not talking about dealers here. We're talking about guys who own salvage yards. Guys that buy junk, right? Guys that buy cars that are inoperable and you'd say, yeah, okay, you pay me to tow it and I'll give you $100, you know, above what my towing cost is, right? Or you get it to my lot and you can drive it there. I'll pay you $500 for it as is. I don't care because here's what I'm going to do. I'm going to pull anything off of it. The knobs on the radio, somebody might need those. I mean, that kind of, that's what we're looking at. And so nobody cares in that business whether the car runs or not because by definition the guy's buying it for the scrap value, which means in the end, maybe he's just selling it for the sheet metal cost, right? And so why shouldn't we have at least figured that number in, whether it's $100 or $200 or $300, particularly when you're looking at 70% of the cars? Your Honor, at the time of the sentencing, those numbers simply are not in the record. We had, we all came up with multiple calculations to put forward to the court and the government expert looked at what had been done in previous cases and came up with a methodology that in his view looked at the loss that we know occurred, which is that all of these victims overpaid relative to what they got. And so he placed himself in the position of the victims making that buying decision. And what did they want? What did they get? How much did they overpay? And those are the numbers that were considered by the district court and it was not air for the district court to accept them. Excuse me. We have a case called United States against Arrington, I believe, which suggests that the district court can, in certain circumstances at least, shift the burden of proof to prove the offset to the defendant. Is that something that you would have any interest in having done? I think that's reasonable, Your Honor, here, especially when, again, the court is tasked with making a reasonable assessment of loss. And as the Tenth Circuit noted, that when the defendant is trying to claim an offset, trying to say, well, you should reduce the loss by the fair market value of an item, then they have the opportunity to tell the district court what the fair market value of that item is. And here that was not done. The defense submitted their experts' calculations. They are clearly flawed. They rest on a flawed premise, as acknowledged by the district court, and it was not clear air to reject it. In the reply brief, the defendant argues that the district court erred by assuming that the experience of eight to nine victims matched the experience of others. But again, those were examples of the experience of some of the purchases. No one claimed that they were anything other than that. And they were not the basis for the restitution awards. Again, that was the information that was in the government's spreadsheets. I agree with the court earlier to the point that the average person would not know what the value is that they were cheated out of. They certainly don't have all the information that the defense had, that the prosecution had, and they are not aware of the legal standards for loss and restitution. The defendant also, in their reply brief, argues that the cases are looking at losses under the guidelines, but the factors that the court has looked at in those cases, the reasoning, it really applies in either context, under the sentencing guidelines and under restitution. Similarly, looking at the defense in the reply, asks that the court apply the 40% amount from the Whitlow case, but that case suffers from the same flaw that the defense expert calculation does. In that case, the court looked at the NADA website and based it off of a commercial car buying guide, which everyone agreed, both experts agreed, that that case was flawed. That is all I have, unless the court has any other questions. Thank you. Thank you. Ms. Jansen, I believe that you used all of your time, but I will give you one minute for a rebuttal. Thank you, Your Honor. Your Honors, the government would like to take one or two or potentially three samples out of the eight victim statements and extrapolate that to the 47 vehicles in this case. The question is, why do we not go the other way? When we look at these eight victim statements, we have at least five people who are receiving the full value of their car. They all report they have had no problems. They continue to own the car. They continue to drive the car. Why is it not more reasonable to extrapolate that to the entire batch of 47 people, instead of taking the one or two negative experiences and ordering Mr. Forrest to pay speculative amounts of restitution when the government simply does not have sufficient information to support the restitution claims that it's arguing for? It reminds me a bit of the Supreme Court case on obscenity. I don't know what reasonable is, but I know what is not reasonable. I know it when I see it, and this is not reasonable, Your Honors. We do ask that you reverse for a new restitution finding. Thank you. The matter is taken under advisement, and the court will rule in due course. I thank you very much for your time and argument in your briefing here today. It's been most helpful to the court. The clerk will call the next case.